IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MARK S. DONNAN,
      Plaintiff,

vs.                               Case No.: 5:17cv148/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 7, 8). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

## I.    PROCEDURAL HISTORY

On September 24, 2013, Plaintiff filed an application for SSI, and in the application he alleged disability beginning August 12, 2013 (tr. 12).[1] His application was denied initially and on reconsideration, and thereafter he requested a hearing before an administrative law judge ("ALJ").  A hearing was held on February 1, 2016, and on March 17, 2016, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 12–19).  The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

## II.    FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 12–19):

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on August 18, 2017 (ECF No. 12).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

Case No.: 5:17cv148/EMT

(1)     Plaintiff had not engaged in substantial gainful activity since September 24, 2013, the application date[2];

(2)     Plaintiff had the following severe impairments: status-post cardiovascular accident ("CVA") in August 2013 and essential hypertension;

(3)     Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (section 11.04 of the Listing of Impairments was given particularized scrutiny in reaching this conclusion);

(4)     Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 416.967(c).  Plaintiff could lift and carry, push, and pull fifty pounds occasionally, and twenty-five pounds frequently.  With normal breaks in an eight-hour day, Plaintiff could sit, stand, and/or walk for six hours;

(5)     Plaintiff was capable of performing his past relevant work as a cabinet maker, finish carpenter, and furniture repairer.  This work did not require the performance of work-related activities precluded by Plaintiff's RFC;

(6)     Plaintiff had not been under a disability, as defined in the Act, since September 24, 2013, the date the application was filed.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only

_____

[2] Thus, the time frame relevant to Plaintiff's claim for SSI is September 24, 2013 (the date he applied for SSI) through March 17, 2016 (the date the ALJ issued his decision).  See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file).

when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates

against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.   If the claimant is performing substantial gainful activity, he is not disabled.

2.   If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks disability insurance benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

   A.    Personal History

   Plaintiff testified at his February 1, 2016, hearing as follows.  He stated he was 59 years old at the time of the hearing, single, and living in a house with his brother (tr. 27–28).  When asked when he was last employed, Plaintiff answered that, up until his stroke, he was self-employed making furniture (tr. 28–29).

   When asked about his typical daily activities, Plaintiff responded that "every other day or every third day I'll — I'll have a vomit vile from being tubes to my brain [sic] and then I sleep at least 12 to 14 hours a night" (tr. 31).  Plaintiff added that he usually throws up before he eats but that it could happen any time because he is always nauseous and dizzy (tr. 32).  He stated that when he exerts himself, such as by going to the grocery store, he may have to lie down for a while to try to keep from throwing up (tr. 39).  Plaintiff stated that he carries a "barf bag" with him and that he has "spontaneous vomiting" two or three times per month, but mostly in the morning (tr. 41–42) .

   Plaintiff indicated that he makes his own meals and can bathe and dress himself, although it is difficult for him to shower because of balance issues (tr. 32–33).  He stated he goes to the grocery store and the laundromat but can walk no more than an

hour (tr. 33). He indicated he had difficulty standing because he became "wobbly," but could sit without difficulty as long as he had a neck brace or other support (*id*.). Plaintiff estimated that he could lift and carry ten to fifteen pounds (*id*.).

When asked what was the most severe thing that bothered him, Plaintiff answered his balance (tr. 34). Plaintiff added that his balance problems occur every day and that he was "known to fall down by just turning around" (tr. 35). He stated that he falls approximately twice per month (tr. 41). Plaintiff also mentioned the constant "pressing" he felt in the back of his head, as if he were wearing a wood clamp (tr. 34). He commented that he might get car sick if he is in a car for two hours or so (tr. 35). He added: "I have many problems. When I walk, I kind of veer to the right and it looks, like, I'm a drunkard. And then my memory, my — sometimes my eyesight if it's too bright outside, it's almost, like, snow blindness." (*id*.).

Plaintiff also described having had hand tremors since his brain surgery, which cause him problems when writing and cause him to drop objects (tr. 37–38). Plaintiff acknowledged he had used marijuana after being told that it would help with his nausea (tr. 38). Plaintiff also stated that he had memory problems, especially short-term memory (tr. 40).

B.    Vocational Expert

A vocational expert ("VE") testified at Plaintiff's hearing. In summary, the VE classified Plaintiff's previous work as a cabinet maker as heavy-level job and his work as a finish carpenter and furniture repairer as a medium-level job (tr. 43–44). When asked about a hypothetical person with Plaintiff's RFC, the VE replied that such a person could perform all of his past work except for that of the cabinet maker (tr. 44). He also testified that the medium-level jobs of hand packer, industrial cleaner, or machine packager could be performed (tr. 45). Whereas in the first hypothetical the ALJ asked the VE to consider that the individual would have "normal breaks in an eight-hour day," for the second hypothetical, the ALJ stipulated that the individual would require at least two additional fifteen-minute rest breaks (*id*.). The VE responded that "[i]t would be very difficult to sustain competitive employment with that many — much time for extra breaks" (tr. 46).

C.     Relevant Medical History

Plaintiff presented to the Bay Medical Center Emergency Department ("BMCED") with a complaint of a headache on the morning of August 12, 2013 (tr. 420). After a CT scan revealed a "subarachniod hemorrhage," Plaintiff was transferred to Shands Hospital in Gainesville, Florida (tr. 430, 435). Plaintiff was determined to have had a ruptured right posterior inferior cerebellar artery aneurysm

(tr. 241–49). Brain surgery was performed, consisting of a micro-surgical clipping of the aneurysm, with a right ventricular drain and a stealth ventriculoperiotoneal shunt being inserted into his brain. (tr. 241–44). Plaintiff's previous diagnoses of hypertension, diabetes mellitus, and diverticulitis were also noted (tr. 213, 425).

On September 18, 2013, approximately five weeks after his surgery, Plaintiff returned to BMCED, complaining of nausea, vomiting, dizziness, and visual field disturbance (tr. 391). Plaintiff stated that his nausea and vomiting had been occurring since he was discharged after surgery, and he described the symptoms as mild but constant (tr. 392). Plaintiff was accepted as an inpatient (tr. 373–417). On September 22, 2013, his date of discharge, Plaintiff was diagnosed with "intractable nausea, vomiting, that was improved," and also with a urinary tract infection and "accelerated hypertension," both of which were treated with medication (tr. 386). Plaintiff returned to BMCED four days later, in the late evening hours of September 26, with complaints of "multiple episodes of vomiting for the past several days" (tr. 373). On September 26 or 27, 2013, a CT scan was performed, which produced the following result: "Negative examination. No evidence of disruption or discontinuity of the VP shunt . . . ." (tr. 384). Plaintiff was discharged on September 27.

On November 2, 2013, Plaintiff returned to the BMCED with complaints of headache, dizziness, nausea, and vomiting (tr. 347). He reported that his nausea and vomiting had been present for weeks, and that his headache had become worse that day (*id*.). Having arrived on a stretcher, Plaintiff presented as unable to walk, and he reported dizziness with movement (tr. 352). Plaintiff also complained of pain in the back of his head, a headache, and a feeling of heaviness on the left side of his head (*id*.). Plaintiff stated he had been having nausea and vomiting for the last three months (*id*.).

A CT scan that was obtained on November 1 or 2, 2013, noted no significant postoperative changes in the suboccipital region or to the ventricular shunt (tr. 369). Though fluid collection in the scalp and white matter ischemia were noted, as well as "[o]ld left basal ganglia lacunar infarct," the doctor analyzing the test results concluded: "[n]o interval change, as described above" (*id*.).

Plaintiff was seen at Gulf View Medical on February 4, 2014, again complaining of intermittent to constant vertigo and intermittent nausea (tr. 456). He was seen by Physician's Assistant Donald Dorenkamp, who noted Plaintiff as having "episodic ataxis with occurrences vertigo [sic]" (*id*.). His assessments included gastroesophageal reflux disease, hypertension, nausea, and vertigo, and he noted

Plaintiff's brain ventricular shunt (tr. 457). Dorenkamp additionally noted that from a neurological standpoint there were "no localized findings, gait stable/steady without assistance, but cautious" (*id.*).

On June 4, 2104, Plaintiff established primary health care at the St. Andrew Community Medical Center ("SACMC"), apparently on a referral from his attorney, and was seen by ARNP Beverly Bond. Plaintiff stated he experienced "occasional periods of vertigo and 'dizziness' since shunt surgery," and he indicated that he exercised "as tolerated with dizziness – rides a bicycle" (tr. 516–17). Neither vertigo, nor nausea or dizziness was included in Bond's assessment (tr. 518). Plaintiff's gait was noted to be slow and deliberate, but steady (*id.*). "Fine upper extremity tremors" were observed bilaterally with arm extension, but Plaintiff's bilateral hand grasp was found to be "intact and equal" (tr. 517–18).

On June 18, 2014, Plaintiff returned to SACMC, reporting two recent episodes in which he vomited (tr. 511). It was noted that Plaintiff "continues to [complain of] periods of vertigo and periods of pressure in his head and tingling" (*id.*).

Plaintiff returned to SACMC on June 25, 2014, reporting that he had vomited that morning. It was noted that Plaintiff continued to have a "squeezing pressure" in his head, but not headaches (tr. 508). A notation was also made suggesting that a referral would be made back to Shands Hospital ("Shands") for a consultation and

evaluation of his shunt (tr. 510). At a July 2, 2014, appointment, Plaintiff related that he was having vomiting episodes three to five times per week, and it was also noted that he "continues to state that when he walks, his gaits [sic] steers him to the right. He continues to have ongoing dizziness as well" (tr. 505). Plaintiff's assessments were amended to include ongoing, episodic nausea and vomiting, and ongoing vertigo (tr. 507). Plaintiff was provided with a prescription of Meclizine for the vertigo/dizziness (tr. 510).

At a July 15, 2014, appointment at SACMC, Plaintiff stated he was having continued dizziness and vomiting and commented that he takes Meclizine for the problem but it "does not seem to have good control" (tr. 502). It was noted that an appointment for Plaintiff with a Dr. Ho at Shands had been scheduled for August 7, 2014 (*id*.). Plaintiff stated he still had the same problem with his gait and the constant squeezing pressure in his head (tr. 502–03).

On July 22, 2014, Plaintiff continued to complain about nausea and dizziness, and stated he was nauseous while in the clinic that day (tr. 499–500). Because of high readings from blood testing, added to his assessments were prediabetes and hypertriglyceridemia, among others (tr. 501).

On August 13, 2014, Plaintiff returned for an appointment at SACMC after having gone to his appointment at Shands. According to Plaintiff, an MRI was

performed at Shands, which showed that the shunt in his head was not occluded and that the ventricles were draining (tr. 496). As evidently explained to Plaintiff while at Shands, the squeezing pressure in his head and vertigo were related to the "incisional position," and "these symptoms including the episodic nausea and vomiting may or may not improve over time" (*id.*).[4]

At an appointment on September 3, 2014, Plaintiff stated that he was doing well and was going to visit and care for his elderly father in Ohio (tr. 494). He then returned to SACMC on November 14, 2014, stating that he was again going to Ohio in order to move his father back with him to Florida (tr. 491). Plaintiff stated he still felt the squeezing pressure in his head but that his nausea and vomiting had "decreased somewhat" (*id.*).

At his January 29, 2015, visit, Plaintiff indicated that he still had the squeezing pressure in his head and that his nausea and vomiting were still occurring two times per week (tr. 488). It was also noted, without explanation, that Plaintiff was still taking his Meclizine but not "as prescribed" (*id.*). At an April 1, 2015, appointment,

---

[4] The court could not find the MRI or any other medical documentation from Shands itself concerning to this follow-up appointment. Instead, the information provided in this paragraph is derived from medical notes taken by ARNP Bond, which in turn appear to be based upon Plaintiff's own subjective reporting of the visit to Shands.

Plaintiff continued to complain of "intermittent" nausea, vomiting, and dizziness, for which he was still taking his Meclizine twice daily (tr. 485).

During a July 28, 2015, medical visit, Plaintiff indicated he still had "ongoing fullness in his head with a noted increase in fuzziness and forgetfulness" (tr. 532). He further expressed having increased depression and anxiety but noted that "he is no longer vomiting regularly, which is an improvement" (*id*.).

At a September 29, 2015, appointment, Plaintiff related that the Prozac he was prescribed was helping with his depression (tr. 529). Plaintiff also related an incident where he experienced "blurred vision and near vision loss after driving a long distance with no sunglasses while on [his prescribed medication] for tooth abscess" (*id*.). Plaintiff also stated he had gone to Shands for a two-year postoperative follow-up examination (*id*.). Although Plaintiff did not specifically mention his nausea, vomiting, or vertigo, at least such that it was recorded in the medical report, ongoing "N/V" and ongoing vertigo remained as two of the assessments of Plaintiff's medical condition, and his Meclizine was continued specifically for dizziness and nausea (*see* tr. 531, 532).

On a December 18, 2015, medical visit, Plaintiff reported consistent vomiting that morning, as well as tiredness (tr. 528). While the vomiting might have been

caused by the flu, which was listed as a reason for the visit, it was also noted that Plaintiff still had persistent nausea and vomiting, possibly neurogenic in nature (*id*.).

On November 20, 2013, Plaintiff visited Osama Elshazly, M.D., who performed a disability evaluation. After noting that Plaintiff had undergone brain surgery, Dr. Elshazly essentially abstained from evaluating Plaintiff's after-effects from that surgery, stating that "[i]t would be beneficial if we get an opinion from a neurosurgeon about the prognosis of this patient's condition regarding the ventricular peritoneal shunt and how it will affect him in the future" (tr. 451). Likewise, Dr. Elshazly appeared to defer on the matter of any conclusions regarding Plaintiff's disability, stating that "[i]t is up to the disability office regarding determination" (*id*.).

Dr. Elshazly did note Plaintiff's representation that he had been vomiting intermittently, had intermittent shortness of breath and no energy, and was almost bedridden (tr. 449). Plaintiff reported that what bothered him the most was his dizziness, which he experienced on a daily basis (*id*.). Dr. Elshazly also noted that Plaintiff's grip strength and fine manipulation were within normal limits (tr. 450). On a Range of Motion report form, Dr. Elshazly indicated that Plaintiff had full range of motion in all respects (tr. 452–54).

On June 10, 2015, Plaintiff was evaluated by Krzysztof Lewandowski, M.D.

After noting Plaintiff's history with brain surgery and the placement of the shunt, Dr.

Lewandowski provided the following:

> Patient states that he is imbalanced and gets dizzy when twisting or bending. Occasionally he falls backwards. He does not have muscle weakness but has difficulty "transforming his decisions into movements." A few times a week he has nausea and vomiting. It happens when he is stressed. Patient is borderline diabetic.

(tr. 461).

Dr. Lewandowski noted that Plaintiff had arrived at his office alone, that he

walked without a limp and without an assistive device, and that he dressed and

undressed without help (*id.*). Dr. Lewandowski then gave the following impressions:

> This patient had [a] CVA 20 months ago. It seems that he did not sustain significant neurological impairment. His speech is normal. There is no weakness or paralysis. His manual dexterity and gait seem to be normal. He may be having subtle neurological problem [sic] which I did not detect during this examination. He seems to be functioning without a problem while in the office with normal gait and balance. He could tip-toe and heel walk and did not need [an] assistive device for ambulation. Although his strength is not limited, he may need to be careful with unprotected heights and situations requiring sudden changes.

(tr. 462).

Accordingly, Dr. Lewandowski completed a form titled "Medical Source

Statement of Ability to Do Work-Related Activities (Physical)." He indicated on the

form that Plaintiff would be capable of lifting up to 100 pounds continuously; of

sitting, standing and walking for a total of eight hours without interruption; of reaching, handling, fingering, feeling, pushing or pulling continuously; and of continuously climbing stairs, ramps, ladders or scaffolds, balancing, stooping, kneeling, crouching and crawling (tr. 464–66). The only less-than-superlative grades that Dr. Lewandowski gave to Plaintiff on the form were that Plaintiff could tolerate exposure to unprotected heights only occasionally and to moving mechanical parts and to operating a motor vehicle only frequently (not continuously) (tr. 467). Dr. Lewandowski did not provide an answer where the form asked if the limitations he had found have lasted or would last for twelve consecutive months (tr. 468).

In a letter dated March 6, 2014, Physician's Assistant Donald Dorenkamp provided a medical opinion based on his encounter with Plaintiff at Gulf View Medical in February of 2014. In the letter he states that he did not have access to Plaintiff's past surgical records (tr. 525). Dorenkamp provides:

> [Plaintiff's] physical assessment post-operatively after his atrio-vetntricular [sic] shunt have left him with diminished capacity in proprioceptive capabilities. These limitations result in intermittent to constant vertigo, nausea and an inability to position himself three dimensionally in space. This severely limits or restricts what he can safely or successfully do throughout the day. He is on medications to support him palliatively, but long term resolution of the condition is most probably unattainable pharmacologically or surgically. Sensory integration or alternative treatments may improve his condition, but the long term prognosis still remains poor. He requires evaluation by a physiatrist to adequately determine his limitations/disabilities or what may possibly improve his condition in the future.

(tr. 525).

Plaintiff also underwent two disability determinations from state agency physicians. The first one was performed on December 12, 2013, by Sean Cook, SDM, who found Plaintiff not disabled (tr. 66). Noting Plaintiff's brain surgery and subsequent testing, Cook provided a diagnosis that included "CVA, late effects of cerebrovascular disease" (tr. 63). Cook found Plaintiff to be partially credible in his subjective reporting of his symptoms, citing his abilities to drive short distances and perform errands and household chores (tr. 64). Cook also referenced Dr. Elshazly's November 20, 2013, examination, specifically the findings of normal motor strength, grip, and ability to speak (tr. 65).

The second disability determination, deemed a reconsideration of the first, occurred on March 26, 2014, and was performed by Cristina Rodriguez, M.D., who also found Plaintiff not disabled (tr. 77). Dr. Rodriguez identified essentially the same findings of medical fact as did Cook, but additionally noted Dorenkamp's medical impressions from February 4, 2014 (tr. 73).[5] Dr. Rodriguez also found Plaintiff to be partially credible, opining that "[t]here are some allegations and symptoms that appear in my judgment, to be disproportionate to the expected severity and duration that

---

[5] In both disability determinations, Dorenkamp is misidentified as a doctor, and his last name is spelled "Dovenkamp."

would be expected on basis of the claimant's medically determinable impairments" (tr. 74). Neither disability determination addressed Plaintiff's vertigo, dizziness, and/or nausea, Dorenkamp's assessment of vertigo, or his letter of March 6, 2014, discussing same.

## V. DISCUSSION

Plaintiff contends that, while assessing Plaintiff's RFC, the ALJ erred by failing to articulate adequate reasons for discrediting Plaintiff's subjective testimony regarding his symptoms.

A claimant may establish that he has a disability through his own testimony regarding his pain or other subjective symptoms. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam). The claimant must show: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged symptoms arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged symptoms. *Id.*; *see also* Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b). While the presence or absence of evidence to support the claimed severity of symptoms is not conclusive, it is a factor to be considered. Marbury v. Sullivan, 957 F.2d 837, 839–40 (11th Cir. 1992); Tieniber v. Heckler, 720 F.2d 1251,

1253 (11th Cir. 1983). The ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Tieniber, 720 F.2d at 1255. The ALJ should consider the claimant's history, the medical signs and laboratory findings, the claimant's statements, statements by physicians, and other evidence relating to how the symptoms affect the claimant's daily activities and ability to work. 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c); Social Security Ruling ("SSR") 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).

Plaintiff testified that he is unable to work due to his vertigo, nausea, and vomiting, along with difficulties with balance, head pressure, difficulty with bending and standing, and problems with hand tremors, and he asserts that these symptoms commenced directly after and on account of his stroke. Likewise, the medical record, as recounted above, demonstrates that Plaintiff consistently complained of his vertigo and associated issues in the months following his stroke. The ALJ, however, found these symptoms to be non-severe.

In so finding, the ALJ determined that Plaintiff's representations as to the intensity, persistence, and limiting effects of his symptoms were "not entirely credible" (tr. 17). The ALJ made the following findings with respect to the medical record:

> Somewhat consistent with the allegations of the claimant, the remarkably limited record of treatment in this case shows that he had a stroke in

August 2013. A CT scan performed on his head three months subsequent to the stroke indicated that he continued to experience residual effects of the cardiovascular accident. Sharply inconsistent with the claimant's hearing testimony, the most recent evidence of treatment indicate [sic] that the claimant has advised his treatment team that his vomiting episodes have decreased in frequency and that his main complaints include blurred vision associated with long road trips without sunglasses relieved by napping and increased forgetfulness rather than daily dizzy spells.

(tr. 17).

The ALJ's reference to "the most recent evidence of treatment" is to Plaintiff's September 29, 2015, appointment in which he reported having vision problems after driving a long distance while on medication for an abscessed tooth (tr. 529). This incident appears to be a single episode rather than a shift in the overall course of Plaintiff's medical condition and treatment needs.

The ALJ's suggestion that the vision issue had become Plaintiff's main complaint, essentially replacing his vertigo and nausea, does not appear to be supported by the record. In fact, it rather seems the case that the driving incident simply took precedence among Plaintiff's complaints during the one particular appointment because it had happened contemporaneously. In other words, while Plaintiff had reported during this time that his vomiting had lessened, perhaps significantly, this did not mean that all his associated symptoms (vertigo, dizziness, balance issues) had altogether ceased, particularly in light of: (1) the regularity with

which Plaintiff had previously complained of these symptoms after the surgery, and (2) Plaintiff's later testimony at his hearing stating that his symptoms remained a problem. That said, the ALJ's opinion is fairly ambiguous as to what Plaintiff's limitations might have been prior to the time that Plaintiff reported his symptoms to be improving. The ALJ only describes the medical record during this earlier time period as being "somewhat consistent" with Plaintiff's testimony, and in so stating, the ALJ references only the fact of the stroke itself and the CT scan which showed "residual effects."

Importantly, the ALJ does not address the length of this earlier period as it relates to the statutory standard regarding disability. The standard requires a disabling condition "which *has lasted* or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i)(1) (emphasis supplied). Hence, critical to an analysis of disability is whether an impairment has either prevented substantial gainful activity for a period of twelve months or is expected to last that long at the time it is evaluated. *See* 65 Fed. Reg. 42774 (2000); Barnhart v. Walton, 535 U.S. 212, 217, 122 S. Ct. 1265, 1269, 152 L. Ed. 2d 330 (2002). Thus, the fact that Plaintiff's health might have sufficiently improved later on—as cited by the ALJ—does not change the fact that earlier he was

not improved and may well have been under a disabling condition that lasted for twelve months following his stroke.

The ALJ also cited to medical opinions to support his determination that Plaintiff was not disabled, but the court does not find that his findings in this regard are substantially supported. Dr. Elshazly's disability evaluation, which was provided approximately three months after Plaintiff's surgery, showed great uncertainty as to Plaintiff's prognosis in the aftermath of his surgery. Consequently, Dr. Elshazly essentially refrained from providing an opinion as to Plaintiff's disability and recommended that he be further evaluated by a neurosurgeon. Thus, while Dr. Elshazly may have found Plaintiff to have full range of motion as to physical movements, this hardly provides a complete picture as to Plaintiff's capabilities at the time. Yet, the ALJ found that Dr. Elshazly's evaluation results were "essentially normal" (tr. 17).

Likewise, Dr. Lewandowski's evaluation and opinion of June 10, 2015, *nearly two years after Plaintiff's stroke*, expressed some reservation as to Plaintiff's neurological issues, though his conclusions were firmer than Dr. Elshazly's. Dr. Lewandowski suggested that the neurological issues were "subtle" ones that he might not have been able to "detect" during his physical examination (tr. 462). Nonetheless, Dr. Lewandowski noted Plaintiff's lack of observable neurological impairment "while

in the office" and found him to otherwise have normal physical ability. The ALJ assigned great weight to Dr. Lewandowski's opinion, whom he noted had identified one limitation that Plaintiff "be careful with unprotected heights and situations requiring sudden changes" (tr. 17, 462).

The ALJ did note the opinions of Physician's Assistant Dorenkamp, particularly his findings that Plaintiff's chronic nausea and vertigo affected his abilities "to position himself three dimensionally in space" and "severely limit[] or restrict[] what he can safely or successfully do throughout the day," but the ALJ gave his findings little probative weight (tr. 17–18, 525).[6] Curiously, the ALJ deemed Dorenkamp's opinion a "snapshot view of the claimant" because Dorenkamp produced documentation of only one medical visit with Plaintiff (tr. 17–18), while the ALJ did not take a similarly diminished view of the opinions of Drs. Elshazly and Lewandowski even though they appeared to have seen Plaintiff only once as well. In any event, Dorenkamp's opinion would at least stand for the proposition that, at the "month seven marker" along the twelve-month timeline, there was at least one "snapshot view" expressing concern over Plaintiff's neurological repercussions and

---

[6] The ALJ noted that, as a physician's assistant, Dorenkamp was not qualified to establish the existence of a medically determinable impairment but could be relied upon to demonstrate the severity of an impairment and how it might affect the ability to work. *See* 20 C.F.R. § 404.1513(a), (d); *see also* <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1160 (11th Cir. 2004).

the need for an evaluation from a neurologist or other expert to help determine the extent of Plaintiff's limitations.

In sum, the court finds that the ALJ did not adequately support his credibility assessment of Plaintiff's testimony using the record in this case. Rather, much of the record evidence supports Plaintiff's testimony, if only from the fact that the medical records consistently note his subjective reporting of his symptoms and their debilitating effects. While medical opinions cited by the ALJ might otherwise support his finding, it cannot be overlooked that those opinions came with a significant caveat, that those giving the opinions were not qualified as neurological experts to evaluate Plaintiff's symptoms of vertigo and nausea. While such an evaluation is lacking in the file, the court also notices a glaring omission in the record, documentation of the followup evaluation from Shands that, *according to Plaintiff*, held that Plaintiff's symptoms may or may not improve over time.

Moreover, the court is reminded that the ALJ made no explicit reference to the possibility that Plaintiff's symptoms might have been more debilitating during the first twelve months following his stroke. The court therefore cannot discern whether the ALJ, while reviewing Plaintiff's symptoms and the available records, was cognizant of the possibility that Plaintiff could be found disabled based alone on this time period.

Finally, the court notes Plaintiff's second claim, which directly follows from the first, that the ALJ failed to pose hypothetical questions to the VE that included limitations reflecting Plaintiff's symptoms of vertigo, nausea, and the like. The court notes that the second hypothetical posed by the ALJ, concerning a hypothetical individual who would need at least two additional fifteen-minute rest breaks during the course of a working day, *might* have been asked with regard to Plaintiff's problems with vertigo and nausea. The ALJ gave no indication that this was the case, but if it were, it goes without saying that the VE's response, that it would be very difficult for that individual to hold a job, would be of critical importance.

## VI.   CONCLUSION

For the reasons provided above, this case should follow the general rule when errors occur which is to reverse and remand for additional proceedings. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223–24 (11th Cir. 1991).

Accordingly, it is hereby **ORDERED**:

1.    That the Commissioner is directed to remand this case to the Administrative Law Judge for further proceedings consistent with this Order.

2.      That **JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C.

§ 405(g), **REVERSING** the Commissioner's decision and **REMANDING** this case

for further administrative proceedings.

3.      That the Clerk is directed to close the file.

**DONE AND ORDERED** this 30th day of January 2019.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**